```
             IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
                      HOUSTON DIVISION
```

WILLIAMS FIELD SERVICES GULF     §
COAST COMPANY, L.P.,             §
                                 §
                Plaintiff,       §
                                 §
v.                               §
                                 §
MARINER ENERGY INC.; MARINER     §
ENERGY RESOURCES, INC.; NOBLE    §   CIVIL ACTION NO. H-06-03846
CORP.; NOBLE DRILLING (U.S.)     §
INC.; NOBLE DRILLING SERVICES,   §
INC.; DELMAR SYSTEMS, INC.;      §
SEACOR MARINE LLC; FUGRO         §
CHANCE, INC.; and CRESCENT       §
DRILLING & PRODUCTION, INC.,     §
                                 §
                Defendants.      §

**MEMORANDUM OPINION AND ORDER**

In 2005 an undersea gas pipeline owned by Williams Field Services-Gulf Coast Company, L.P. ("Williams") was allegedly damaged by an anchor from the Lorris Bouzigard, a drilling rig. Williams brought this action claiming negligence, maritime liability (including negligence under maritime law), breach of contract, trespass, and gross negligence against defendants Mariner Energy Inc. ("Mariner"), Noble Corp. ("Noble"), Delmar Systems, Inc. ("Delmar"), Seacor Marine LLC ("Seacor"), Fugro Chance, Inc. ("Fugro"), and Crescent Drilling & Production, Inc. ("Crescent Drilling"). Pending before the court is Mariner's Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Docket

Entry No. 113). For the reasons explained below, the court will deny Mariner's motion.

## I. Factual and Procedural Background

In 2005 an anchor from the Lorris Bouzigard came into contact with an undersea gas pipeline owned by plaintiff Williams.[1] Williams alleges damages in excess of $30,000,000.[2]

The Lorris Bouzigard was a drilling rig provided by defendant Noble.[3] In order to drill an exploratory well in the Gulf of Mexico in Viosca Knoll Block 992, defendant Mariner (an oil and gas producer and supplier) allegedly contracted with Noble (for the rig) and with defendants Delmar (for anchor handling and retrieval), Seacor (for support vessels), Fugro (for surveying), and Crescent Drilling (for a company representative to be on board the rig).[4] The controversy surrounding the retrieval of Anchor No. 2 forms the basis of this suit.[5]

---

[1] Mariner's Motion for Partial Summary Judgment and Incorporated Memorandum of Law ("Mariner's Motion"), Docket Entry No. 113, pp. 1-3.

[2] Plaintiff's First Amended Complaint, Docket Entry No. 3, p. 10.

[3] Noble Defendants' Response to Mariner Defendants' Motion for Partial Summary Judgment ("Noble's Response"), Docket Entry No. 129, p. 3.

[4] Mariner's Motion, Docket Entry No. 113, pp. 1-3.

[5] Plaintiff's First Amended Complaint, Docket Entry No. 3, pp. 6-7.

Mariner has filed a Motion for Partial Summary Judgment and Incorporated Memorandum of Law.[6] Mariner argues that it did not have operational control over the other defendants and that it is therefore not liable for any negligence that these independent contractors may have committed. Mariner further argues that it was not involved in the anchor retrieval operations, and that summary judgment is therefore appropriate on the question of its own negligence in connection with this incident.[7]

Noble,[8] Williams,[9] Fugro,[10] Delmar,[11] and Crescent Drilling[12] have all filed separate responses to Mariner's Motion. Mariner

---

[6]Mariner's Motion, Docket Entry No. 113.

[7]Mariner mentions Williams' claims for breach of contract and trespass only in a footnote. Mariner's Motion, Docket Entry No. 113, n.3. Because this issue has not been adequately briefed to the court, the court is not in a position to rule on it.

[8]Noble's Response, Docket Entry No. 129.

[9]Plaintiff's Response to Defendant Mariner's Motion for Summary Judgment ("Williams' Response"), Docket Entry No. 130.

[10]Fugro Chance, Inc.'s Response to Mariner Energy, Inc.'s Motion for Partial Summary Judgment ("Fugro's Response"), Docket Entry No. 131.

[11]Memorandum in Opposition to Mariner's Motion for Partial Summary Judgment on Behalf of Delmar Systems, Inc. ("Delmar's Response"), Docket Entry No. 132.

[12]Crescent Drilling & Production, Inc.'s Response to the Mariner Defendants' Motion for Partial Summary Judgment ("Crescent Drilling's Response"), Docket Entry No. 133. Crescent Drilling argues that while Mariner lacked operational control over the other defendants, it retained operational control over Norman Boss, Crescent Drilling's own employee. Crescent Drilling's Response, p. 2.

filed a Reply,[13] Williams filed a Sur Reply,[14] and Mariner filed a Supplemental Reply.[15]

## II. <u>Applicable Law</u>

### A. **Summary-Judgment Standard**

Summary judgment is appropriate if the movant establishes that there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2511 (1986). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 106 S. Ct. 2548, 2552 (1986).

A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not *negate*

---

[13]Mariner's Reply in Support of Its Motion for Partial Summary Judgment ("Mariner's Reply"), Docket Entry No. 135.

[14]Plaintiff's Sur Reply to Mariner's Reply in Support of Its Own MSJ ("Williams' Sur Reply"), Docket Entry No. 136.

[15]Mariner's Supplemental Reply in Support of Its Motion for Partial Summary Judgment ("Mariner's Supplemental Reply"), Docket Entry No. 137.

the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (quoting Celotex, 106 S. Ct. at 2553). If the moving party meets this burden, Rule 56(c) requires the nonmovant to show that specific facts exist over which there is a genuine issue for trial. Id. (citing Celotex, 106 S. Ct. at 2553-54). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2110 (2000).

**B.   Principal's Liability for Independent Contractors**

A principal is generally not liable for the torts of its independent contractors. Wallace v. Oceaneering Int'l, 727 F.2d 427, 437 (5th Cir. 1984); Landry v. Huthnance Drilling Co., 889 F.2d 1469, 1471 (5th Cir. 1989). Where a principal "exercises operational control over or expressly or impliedly authorizes the independent contractor's actions," the principal may be held liable. Landry, 889 F.2d at 1471. In order for this exception to the general rule to apply, "[t]here must be such a retention of right of supervision that the contractor is not entirely free to do the work in his own way." Id. at 1471 (quoting Restatement (Second) of Torts § 414, comment c). Such operational control must consist of more than the simple power to order a stop to or resumption of work, the right to inspect the work or receive progress reports, the right to make nonbinding recommendations, or

-5-

the right to dictate "alterations or deviations."  Id.  The presence of a company man or representative, even one making inspections, is not sufficient to put the principal in operational control.  Fruge v. Parker Drilling Co., 337 F.3d 558, 564 (5th Cir. 2003) (applying Louisiana negligence law, as required by the Outer Continental Shelf Lands Act).  As the Fruge court explained: "Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way."  Id. at 564.  The parties disagree over which Fifth Circuit authority is most relevant to the pending motion.  Mariner argues that the relevant and decisive facts of this case are most analogous to those in Landry.[16]  The plaintiff in that case was a tong operator who was injured while working with pipes and connectors that were supplied by the defendant.  Landry, 889 F.2d at 1469-70.  While the defendant had a company man present, it was clear that the plaintiff was the top expert and "ran the show" as to the operation of the tongs.  Id. at 1470.  The appeals court rejected the plaintiff's claim that the limited orders[17] given by the defendant amounted to operational control:

---

[16]Mariner's Motion, Docket Entry No. 113, pp. 12-13.

[17]The plaintiff in Landry described the orders as follows: "'We started running pipe.  Then my tongs would come down a little bit, but I was satisfied with them.  But Irving [Estave] wasn't satisfied with them, and he kept telling me to pick up my tongs.'" Landry, 889 F.2d at 1471 (alteration in original).

> The [defendant's] representative gave [the plaintiff] orders because he wanted certain results reached – to protect the pipe and connectors from damage while torque was applied – but he never told [the plaintiff] how to do his job.  He never told [the plaintiff] how to rig, counterbalance, raise or lower the tongs.  Nor is there evidence that [the plaintiff] was prevented from further adjusting the counterbalance had he wished to do so.

Id. at 1472.  The district court granted and the Fifth Circuit affirmed directed verdict for the defendant, finding that the defendant lacked operational control over the tong operator.  Id. at 1470.

Williams argues that the case that should control here is Texas E. Transmission Corp. v. McMoRan Offshore Exploration Co., 877 F.2d 1214, 1222 (5th Cir. 1989).[18]  In that case the Fifth Circuit held that the principal did have operational control over its independent contractors, even though the contract between the principal and contractor assigned the responsibility to the contractor and provided that the principal "shall have no direction or control of Contractor."  Texas Eastern, 877 F.2d at 1222.  Texas Eastern involved the attempt to retrieve a drilling rig's anchor that had hooked and damaged an undersea pipeline.  Id. at 1216-19.  The principal in that case had a company man on board the rig who halted the retrieval operations at one point, but then agreed to recommence them.  Id.  Despite the lack of contractual control, the court found that the principal exercised actual control when he intervened in the retrieval, first by halting operations and second

---

[18]Williams' Response, Docket Entry No. 130, pp. 20-25.

by recommencing them. Id. at 1222. The court also emphasized the fact that the company man there was not ignorant of what was going on. Id.

**C.  Negligence**

The Fifth Circuit recently summarized the elements of negligence under both maritime law and the general common law:

> To state a claim for relief under maritime law, the plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by the plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.

In re Great Lakes Dredge & Dock Co., 624 F.3d 201, 211 (5th Cir. 2011) (internal quotation marks and marks of alteration removed). The plaintiff is owed a duty of ordinary care under the circumstances. Id. The scope of that duty includes a determination as to the foreseeability of the harm suffered by the plaintiff. Id.

A harm is foreseeable if it "might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention." Id. (internal quotation marks removed). To be foreseeable, the harm "must bear some proximate relationship with the negligent conduct such that it can reasonably be said to be within the 'scope of the risk' created by that conduct." Id. at 212.

In order to satisfy the element of legal causation, the plaintiff must show more than 'but for' causation. The plaintiff must show that the negligence of the plaintiff was "a 'substantial factor' in causing the injuries." Id. at 213-14; accord Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).

### III. Analysis

#### A. Operational Control

Having carefully considered the parties' arguments, the court concludes that the evidence raises genuine issues of material fact whether Mariner had operational control over Norman Boss (Mariner's company man on the rig)[19] and over the other contractors (directly or through Boss).

##### 1. Did Fisher Give Orders Regarding Anchor Retrieval?

William Fisher, Mariner's deepwater operations manager at the time of the incident in question,[20] testified that he gave "orders to Norman Boss" after the initial anchor retrieval attempts that "[i]f it didn't work out relatively quickly and come up as they suggested it might, to immediately call me."[21]

---

[19]Mariner's Motion, Docket Entry No. 113, pp. 6-7 (stating that there is no dispute that Boss was Mariner's representative on the rig).

[20]Deposition of William F. Fisher, Exhibit I to Noble's Response, Docket Entry No. 129, p. 10:18-22.

[21]Id. at 74:7-16.

Fisher also testified that he gave the order to cut the wire connecting the rig to Anchor No. 2.

> The next time I remember significantly and clearly, Norman called me back up and said he still couldn't get it [Anchor No. 2]. At that time I no longer believed his feedback. I told him to cut the wire because at that point I was convinced that - - whether anybody else out there was convinced or not, I was convinced that they had hooked that pipeline and I didn't want it further damaged if it'd, in fact, been damaged.[22]

This evidence is sufficient to create a fact issue whether Fisher was giving orders regarding anchor retrieval.

Moreover, there is other evidence of Fisher's involvement in anchor-retrieval operations. This evidence includes the daily reports Fisher was receiving from the rig,[23] Fisher's testimony regarding his decision making over whether to halt operations,[24] Fisher's teleconferences with onshore Delmar personnel during the period in question,[25] and Fisher's testimony that if more feet of

---

[22]Deposition of William F. Fisher, Exhibit A to Mariner's Reply, Docket Entry No. 135, p. 66:4-11.

[23]Deposition of William F. Fisher, Exhibit 1 to Williams' Response, Docket Entry No. 130, pp. 51:8-52:24.

[24]Fisher testified that he had a "gut feeling" that they had hooked the pipeline, but decided not to shut down anchor retrieval operations while the rig moved on to get the other anchors because he "[d]idn't see a reason to" and he "thought whatever damage that may have occurred had already occurred." Id. at 68:3-25. In response to a question as to why he did not instruct Boss to cut the anchor line during the first call from the rig, Fisher responded: "Because he [Boss] provided me with a map that showed where the X and Ys of where the anchor was, where the rig was, and where the pipeline was and it didn't seem like the appropriate thing to do at the time." Id. at 69:8-14.

[25]Id. at 66:17-24. Fisher testified that it was possible that he talked to Noble personnel during this period as well. Id.

wire were paid out on the anchor than anticipated, Boss or Noble should have contacted him so that a "mutual decision" could be made before proceeding.[26]

In addition, the Seacor Resolve's log of activities on December 13, 2005, contains entries that could evidence Mariner's control over anchor operations (whether from Fisher or through Boss). The last five of these entries are: "Resolve J locking chain and bringing up to roller"; "Boats report being pulled to north; all stop have Rigor put anchor back on bottom"; "Have meeting with all parties"; "Resolve paying out wire and shaking free from system as per Mariner"; "Having Resolve chase back and get off anchor as per Mariner."[27]

Viewed together, there is ample evidence to create a fact question whether Fisher and Mariner were giving orders regarding anchor retrieval and whether those orders rose to the level of operational control.

2. <u>Did Boss Have Control Over the Other Contractors?</u>

The court also concludes that there is a genuine issue of material fact over the extent to which Boss exercised operational control over the other contractors. Ryan Roberts (Delmar's mooring

---

[26]"There's no policy or procedure. But I would say if that information was available to Noble, Noble should have made that information available to me and we should have made a mutual decision before proceeding with recovery of that anchor." Deposition of William F. Fisher, Exhibit I to Noble's Response, Docket Entry No. 129, p. 193:1-23.

[27]Exhibit R to Noble's Response, Docket Entry No. 129.

coordinator)[28] testified that Delmar was in charge of the means, methods, and details of how anchor retrieval was to be performed.[29] Williams argues, however, that under ¶ 603 of the Mariner-Noble contract,[30] Mariner's senior representative was "in charge of all Mariner's Personnel on board." "Mariner's personnel" is defined in ¶ 101 as expressly including "the personnel of Mariner's other contractors." Fisher testified that Boss was Mariner's representative under both ¶ 603 and ¶ 605, but that he and his superiors at Mariner retained some level of control.[31] Bill Chemerinski (a shoreside consultant retained by Mariner who was involved in the daily operations on the Lorris Bouzigard) testified that Mariner exercised its "authority and control" over the rig "through Norman Boss."[32]

---

[28]Deposition of Ryan Roberts, Exhibit M to Noble's Response, Docket Entry No. 129, p. 8:8-10.

[29]Deposition of Ryan Roberts, Exhibit A to Mariner's Motion, Docket Entry No. 113, pp. 16:22-17:8. Matthew Smith (Delmar's corporate representative) testified that it was not Delmar's expectation that Mariner would direct anchor retrieval. Deposition of Matthew Smith, Exhibit C to Mariner's Reply, Docket Entry No. 135, p. 187:22-25. Kirk Atkinson also testified that Mariner was "not directing" the anchor handling. Deposition of Kirk Atkinson, Exhibit D to Mariner's Reply, Docket Entry No. 135, p. 84:1-16.

[30]Domestic Daywork Drilling Contract-Offshore Semisubmersible, Exhibit 2 to Williams' Response, Docket Entry No. 130.

[31]Deposition of William F. Fisher, Exhibit 1 to Williams' Response, Docket Entry No. 130, pp. 27:21-32:16.

[32]Deposition of Carson William Chemerinski, Exhibit 34 to Williams' Response, Docket Entry No. 130, pp. 43:5-44:9.

The "Plan of Attack"[33] for anchor retrieval operations e-mailed by Norman Boss to various people at Mariner before the attempts to retrieve Anchor No. 2 began also raises a question about Boss's control on the rig.[34]  In the e-mail Boss stated that "[t]his is what myself and Delmar have in mind on the anchors at this time." The e-mail then details some of the logistics involved.[35]  The attached file sets out the sequence of actions that various boats will take regarding the anchors.

The evidence raises a fact question as to whether Boss was in operational control of the anchor-handling activities from the Lorris Bouzigard, either under the terms of the relevant contracts or because of Boss's actual activities during the period in question.

3.   Did Mariner Have Control Over Boss?

There is also conflicting evidence that raises a genuine issue of material fact whether Mariner exercised operational control over Boss.  On the one hand, Mariner's contract with Crescent Drilling

---

[33]"Plan of Attack" is the heading on the file.

[34]The e-mail and its attached file are Exhibit 5 to Williams' Response, Docket Entry No. 130.

[35]The e-mail continues:  "The last weather forecast show it to still be rough Friday night at midnight and starting down at 06:00 hrs Saturday.  I would like to have the work boats here for 05:00 am Saturday and we will call out the tug boat once we know we can get on the job.  The time it takes the tug to get here we will have two anchors racked and put him on birdle before pulling the next anchor off bottom."

contained language indicating that it would "have no direction or control over Contractor or its employees."[36] On the other hand, Fisher testified that "[w]hen I hire a company man to do a job, he is responsible to me for every operation that takes place on that drilling rig from the day he steps foot on it to the day he gets on the helicopter and leaves."[37] Moreover, as discussed above, there is evidence that Fisher gave Boss direct orders regarding anchor retrieval, including the instruction that he had only one try to retrieve Anchor No. 2,[38] the order to cut the wire,[39] and another order to go out and "count wraps" to determine how much wire had been paid out.[40] Paragraph 605 of the Mariner-Noble contract[41] provides that if Mariner designates a second representative, that

---

[36]Master Service Contract at ¶ 8, Exhibit D to Mariner's Motion, Docket Entry No. 113.

[37]Deposition of William F. Fisher, Exhibit A to Crescent Drilling's Response, Docket Entry No. 133, p. 159:6-9.

[38]Regarding this order, Fisher testified at his deposition: "But I now seen [sic] a chart where there were multiple attempts to try and hoist that pipeline up. I told Mr. Boss to give it one shot and call me. If the chart I saw where they tried to pick it up multiple times and he waited multiple times before he called me, he failed to do what I had instructed him to do. This was one shot. I was not going to risk my company or the Williams pipeline." Deposition of William F. Fisher, Exhibit 1 to Williams' Response, Docket Entry No. 130, p. 178:15-22.

[39]Deposition of William F. Fisher, Exhibit A to Mariner's Reply, Docket Entry No. 135, p. 66:4-11.

[40]Deposition of William F. Fisher, Exhibit I to Noble's Response, Docket Entry No. 129, p. 198:1-4; id. at 200:20-22.

[41]Domestic Daywork Drilling Contract-Offshore Semisubmersible, Exhibit 2 to Williams' Response, Docket Entry No. 130.

person will be in charge of "the remainder of Mariner's Personnel," including the person designated under ¶ 603. Cory Loegering (Mariner's senior vice-president for deepwater operations) testified that Bill Fisher was the person designated under ¶ 605. Loegering further testified that if there was a dispute on the rig among the contractors about how to proceed, that Boss would not have the authority to adjudicate, but would rather need to involve Fisher.[42] The court concludes that there is sufficient evidence to create a genuine issue of material fact as to Mariner's operational control over its company man, Boss.

4.  Conclusion

The relevant facts of this case are more analogous to those of Texas Eastern than to those of Landry. The plaintiff and other defendants have produced evidence of orders given by Fisher and Mariner that are far more central to the operations in question than the limited orders in question in Landry. In that case the company never gave an order concerning the steps of how to proceed (how to rig, counterbalance, or raise and lower the tongs), but rather gave orders to raise the tongs in order to protect the pipes and connectors. The alleged orders in question here concern details central to how the anchor retrieval was to be done,

---

[42]Deposition of Cory Loegering, Exhibit N to Noble's Response, Docket Entry No. 129, pp. 34:15-35:13; see also Deposition of Matthew Smith, Exhibit P to Noble's Response, Docket Entry No. 129, p. 188:1-16.

including how many attempts were to be made to retrieve Anchor No. 2 and the point at which to cut the wire to Anchor No. 2.

The court in Texas Eastern found that the principal exercised actual operational control when he halted anchor retrieval operations and then recommenced them, all the while being just as informed about the situation as any of the independent contractors. In the present case there is sufficient evidence to create a question as to whether Mariner and Fisher were making decisions and giving orders regarding (1) the continuation of efforts to retrieve Anchor No. 2 (Fisher's testimony regarding his decision making not to halt retrieval, the contractual provisions recited above, Boss's Plan of Attack e-mail), (2) the process of retrieving the anchors (the "one shot" order, the Seacor Resolve's log), and (3) the cessation of anchor-retrieval operations (the order to cut the wire). There is also evidence that Fisher and Mariner were well-informed of happenings on the rig (the daily reports, the consultations with onshore personnel from the contractors).

## B.   Legal Cause and Negligence

Mariner argues that it was not negligent and did not legally cause the alleged damage to Williams' pipeline because "Mariner was not involved in the anchor-retrieval process."[43]  Mariner further

---

[43] Mariner's Motion, Docket Entry No. 113, pp. 1-2.  Mariner also states that "[n]o Mariner employee was involved in deciding how to retrieve the anchor or whether to deploy an ROV prior to or during the attempt." Id. at 2.

argues that Fisher "deferred to the on-scene personnel" and that such deference is not negligence.[44]  Finally, Mariner argues that it is "undisputed . . . that no request for an ROV was ever made to Mariner's Bill Fisher" and that the question of Mariner's negligence as to any issues involving the ROV is therefore dispensed with.[45]

As explained above, there are fact issues regarding Fisher's involvement in the anchor retrieval.  Fisher's testimony that he instructed Boss to attempt only once to retrieve Anchor No. 2 and that he instructed Boss to cut the wire, together with the Seacor Resolve log entries indicating that instructions were given by Mariner, are sufficient to raise a fact question as to Mariner's involvement in the anchor-retrieval process, as well as to whether any such involvement may have been a substantial factor in causing the alleged damage to the pipeline.

Also material to the question of Mariner's negligence is the evidence indicating that Fisher had a "gut feeling" that the anchor was hooked on the pipeline, but made the decision not to halt operations for a number of days.[46]  As discussed above, Fisher testified that he "[d]idn't see a reason to" and he "thought

---

[44]Mariner's Reply, Docket Entry No. 135, p. 9.

[45]Id. at 9-10.

[46]Deposition of William F. Fisher, Exhibit 1 to Williams' Response, Docket Entry No. 130, p. 68:3-25.

whatever damages that may have occurred had already occurred."[47] Fisher also testified that he did not issue the order to stop recovery because he was surprised that the pipeline would have moved given the pull exerted, the size of the anchor, and other factors.[48]

There is also a dispute as to who had control over the ROV. Roberts testified that he "asked [the Mariner representative] if we could use the ROV to give us an exact reference of what was taking place . . . . And he told me the ROV was not an option.  And from what I recall, it was not an option because there was not a 24 hour operating crew for -- for the ROV."[49]  Roberts further testified that he talked to Boss, and to no other Mariner representative, about the possibility of using an ROV to determine on what Anchor No. 2 might be stuck.[50]  Mariner argues that no ROV request was ever made to Fisher.[51]  Fisher testified that he may have had a conversation concerning the ROV with Boss before the line to the

---

[47]Id.

[48]Id. at 72:7-73:7; see also, Deposition of William F. Fisher, Exhibit 3 to Delmar's Response, Docket Entry No. 132, pp. 95:17-96:3.

[49]Deposition of Ryan Roberts, Exhibit 18 to Williams' Response, Docket Entry No. 130, p. 55:11-21.

[50]Deposition of Ryan Roberts, Exhibit A to Mariner's Motion, Docket Entry No. 113, pp. 192:23-193:3.

[51]Mariner's Reply, Docket Entry No. 135, pp. 9-10.

anchor was cut.[52]  Thom Roller (currently drilling completion manager for deepwater)[53] testified that Mariner has ultimate authority over the use of the ROV, including the authority to deny requests coming from the rig to use the ROV.[54]

The court concludes that there is sufficient evidence to raise questions of material fact whether Mariner's negligence caused the damage to Williams' pipeline.

### IV.  Conclusion and Order

For the reasons explained above, Mariner's Motion for Partial Summary Judgment (Docket Entry No. 113) is **DENIED**.

**SIGNED** at Houston, Texas, on this 19th day of September, 2011.

                                                    SIM LAKE
                                       UNITED STATES DISTRICT JUDGE

---

[52]Deposition of William F. Fisher, Exhibit I to Noble's Response, Docket Entry No. 129, p. 185:16-20 ("I'm sure we had a conversation about ROV availability or else he [Boss] and Mr. Chemerinski did because eventually an ROV crew was out there in time to cut the wire when we wanted to depart location. So in that time scale was the ROV conversation.").

[53]Deposition of Thom Roller, Exhibit J to Noble's Response, Docket Entry No. 129, p. 5:23-25.

[54]Id. at 51:10-52:7.